UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————————

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| K-V DISCOVERY SOLUTIONS, INC., *et al.*, | : | Case No. 12-13346 (ALG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

———————————————————————————————

|  |  |  |
|---|---|---|
| SILVER POINT FINANCE, LLC, | : |  |
| WHITEBOX ADVISORS, LLC, | : |  |
| PIONEER INVESTMENT MANAGEMENT, | : |  |
| INC., AND WILMINGTON TRUST, NATIONAL | : |  |
| ASSOCIATION, solely as Trustee for the K-V | : |  |
| Pharmaceutical Company 12% Senior Secured | : |  |
| Notes due 2015, | : |  |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : | Adv. Pro. No. 13-1381 (ALG) |
|  | : |  |
| DEUTSCHE BANK TRUST COMPANY | : |  |
| AMERICAS, solely as Trustee for the | : |  |
| K-V Pharmaceutical Company 2.5% Contingent | : |  |
| Convertible Subordinated Notes due 2033, | : |  |
|  | : |  |
| Defendant, | : |  |
|  | : |  |
| -and- | : |  |
|  | : |  |
| THE OFFICIAL COMMITTEE OF | : |  |
| UNSECURED CREDITORS OF K-V | : |  |
| DISCOVERY SOLUTIONS, INC., *et al.*, | : |  |
|  | : |  |
| Intervenor Defendant. | : |  |

———————————————————————————————

**MEMORANDUM DECISION AND ORDER**

## FACTS

*The Principal Indenture Provisions at Issue*

On May 16, 2003, K-V Pharmaceutical Company ("KV") issued $200 million of 2.5%

Contingent Convertible Subordinated Notes due 2033 (the "Convertible Notes") pursuant to an

indenture, dated as of May 16, 2003 (the "Convertible Notes Indenture") with Deutsche Bank Trust

Company Americas, as trustee.    (Def. Ex. 1, Convert. Indent.)    The Convertible Notes Indenture

is governed by New York law.    (Convert. Indent., § 12.09).

Section 11.01 of the Convertible Notes Indenture provides that payment of any amounts

due on the Convertible Notes are "subordinated in right of payment, in cash or cash equivalent, to

the extent and in the manner stated in this Article XI to the prior payment in full when due of all

existing and future Senior Indebtedness of [KV]."    (Def. Ex. 1, Convert. Indent. § 11.01.)    With

respect to a distribution of KV's assets in a bankruptcy reorganization, § 11.02 provides that "the

holders of all Senior Indebtedness shall first be entitled to receive payment in full, in cash or cash

equivalent, of the principal thereof, the interest thereon and any other amounts then due thereon

before the [holders of the Convertible Notes] are entitled to receive payment on account of the

principal of or interest on or any other amounts due on the [Convertible Notes]."    (Def. Ex. 1,

Convert. Indent. § 11.02.)    Senior Indebtedness is defined in § 1.01 of the Convertible Notes

Indenture as

> the principal of, premium, if any, interest, *including, with respect to the Credit
> Facility, all interest accrued subsequent to the commencement of any bankruptcy
> or similar proceeding, whether or not a claim for post-petition interest is allowable
> as a claim in any such proceeding,* and rent payable on or in connection with, and
> all fees, costs, expenses and other amounts accrued or due on or in connection with,
> [KV's] Indebtedness whether secured or unsecured, absolute or contingent, due or
> to become due, outstanding on the date of this Indenture or thereafter created,
> incurred, assumed, guaranteed or in effect guaranteed by the Company, including
> all deferrals, renewals, extensions or refundings of, or amendments, modifications

2

or supplements to, the foregoing [with certain exceptions].    (Emphasis added).[1]

This case primarily involves the construction of one clause and one term in the Convertible Notes Indenture.   One is the italicized clause, "*including, with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition interest is allowable as a claim in any such proceeding*." The other is the definition of one of the terms used in that clause, "Credit Facility," which is defined in § 1.01 of the Convertible Notes Indenture as:

> that certain Loan Agreement dated as of June 18, 1997, as amended, among the Company, certain subsidiaries of the Company and LaSalle Bank National Association, including all related notes, guarantees, collateral documents, instruments and agreements executed in connection therewith, *as each may be amended, modified, restated, renewed, replaced, refinanced or restructured* (including, without limitation, any amendment increasing the amount of available borrowing) from time to time.   (Emphasis added).

*KV's Issuance of Debt*

The background to KV's issuance of the Convertible Notes and its other debt is largely undisputed.   In 1997, prior to the issuance of the Convertible Notes, KV had entered into a credit facility with LaSalle Bank that consisted of a $22.6 million revolver and letter of credit facility, as well as a secured term loan of $3.5 million (the "LaSalle Facility").   The LaSalle Facility was amended several times and at the time of the issuance of the Convertible Notes in 2003 consisted

---

[1]Section 1.01 defines "Indebtedness" as including,

> (1) all of the [KV's] indebtedness, obligations and other liabilities (A) for borrowed money, including . . . any loans or advances from banks, whether or not evidenced by notes or similar instruments, or (B) evidenced by credit or loan, agreements, bonds, debentures, notes or similar instruments . . .
>
> . . . .
>
> and (7) any and all deferrals, renewals, extensions, refinancings and refundings of, or amendments, modifications or supplements to [the previously described indebtedness, obligations or liabilities of KV].

3

of a $40 million revolving line of credit, a $20 million supplemental revolving line of credit and approximately $12.8 million in term debt.   The LaSalle Facility provided that KV could not incur certain new debt unless the debt was "subordinated in right of payment to [KV's] Liabilities on terms satisfactory to [LaSalle] in each particular case."   (LaSalle Facility, §§ 1.01 and 8.3(c).) There is no dispute that LaSalle consented to the issuance of the Convertible Notes on certain terms and conditions, and as further discussed below, its counsel actually negotiated the language that is critical to a resolution of this dispute.   After the issuance of the Convertible Notes, the LaSalle Facility was again amended several times and restated on December 31, 2004, when it consisted of $154.6 million of committed financing.   Ultimately, on June 9, 2006, KV entered into a new credit facility (the "2006 Citibank Facility") in which ten institutions led by Citibank provided it with an unsecured $320 million revolving line of credit.   The LaSalle facility was paid off and terminated.

In early 2009, KV was prohibited from manufacturing drugs under a consent decree with the United States Food and Drug Authority (the "FDA") and an agreement with the United States Department of Justice.   It entered into nationwide voluntary recalls affecting most of its products and agreed to cease drug manufacture and distribution until it had satisfied certain requirements imposed by the FDA.   Revenues declined dramatically, from $207.8 million in 2008 to $9.1 million in 2010.   The 2006 Citibank Facility defaulted, and the debt was accelerated.   On February 20, 2009, KV repaid all outstanding amounts due under the 2006 Citibank Facility in full from cash on hand, and the 2006 Citibank Facility was terminated.   Thereafter, new financing was not obtained for more than 18 months, and KV funded its operations from cash on hand and cash raised through the sale of assets, tax refunds, and the sale of products manufactured by others but distributed by KV.

4

The parties differ as to KV's ability during this 18-month period to obtain financing. Plaintiffs assert that KV was in crisis mode and continuously sought alternate senior financing but was unable to obtain it as long as the FDA prevented KV from undertaking most business operations  (*see, e.g.*, Ex. X, Bd of Dir. Teleconf. Presentation (Apr. 8, 2010) ("senior debt is our goal")).   The Defendants assert that KV's two financial advisors during that period expressed the belief that it had the ability to obtain financing during this period had it chosen to do so.   (*See*, *e.g.*, Szlezinger Dep., 7/29/2013 at 27:25-28:11).   In any event, in September 2010, the FDA granted KV approval for a limited return to the market.   That same month, KV entered into a financing arrangement with affiliates of Centerbridge Partners L.P. ("Centerbridge").   This $20 million secured bridge loan (the "Healthcare I Facility") was refinanced about two months later when KV entered into a larger senior secured debt financing package with Centerbridge affiliates (the "Healthcare II Facility"), consisting of a $60 million bridge loan and a commitment for a $120 million multi-draw term loan.   The latter commitment was divided into three tranches of debt that would be made available upon KV achieving certain milestones.   Apparently, KV did not draw on any of this debt and instead obtained a new facility.   Pursuant to an indenture dated as of March 17, 2011, between KV and Wilmington Trust N.A., KV issued $225 million in principal amount of 12% Senior Secured Notes due 2015 (the "Senior Notes").   A portion of the funds from the issuance of the Senior Notes was used to pay off the Healthcare II Facility, which was terminated. The Senior Notes are held by the Plaintiffs in this action.

*Procedural History*

KV and several affiliates (the "Debtors") filed petitions under chapter 11 of the Bankruptcy

Code commencing these cases on August 4, 2013.[2]   An Official Committee of Unsecured

Creditors (the "Committee") was formed on August 13, 2012.   The immediate cause of the

petition was an imminent default under a contract for the acquisition of a drug called Makena with

the developer of the drug, Hologic, Inc.   Eventually, certain of the Senior Noteholders provided

DIP financing to enable the Debtors to resolve their disputes with Hologic and assume the Hologic

contract, and the Debtors' financial prospects improved materially.   Thereafter, the Debtors, the

Committee, certain holders of the Convertible Notes (the "Convertible Noteholders"), and certain

holders of the Senior Notes (the "Senior Noteholders") entered into a global settlement of various

issues that has been incorporated into the Debtors' proposed Sixth Amended Joint Chapter 11 Plan

of Reorganization (the "Plan").   As part of that settlement, the parties agreed that a decision in the

instant dispute over post-petition interest would be a condition to confirmation of the Plan.   (*See*

§ 11.1(e) of the Plan).   The hearing on confirmation of the Plan is scheduled for August 28, 2013.

The instant adversary proceeding to resolve the post-petition interest dispute was

commenced on July 3, 2013 when a group of Senior Noteholders and Wilmington Trust, N.A., as

Indenture Trustee for the Senior Noteholders, filed the complaint against Deutsche Bank Trust

Company Americas, as Trustee for the Convertible Subordinated Notes.   On July 18, 2013, the

parties entered into a stipulation allowing the Committee to intervene as a defendant in the action.

In the complaint, the Plaintiffs seek a declaratory judgment that the Convertible Notes are

subordinated to post-petition interest arising under the Senior Notes and that the Senior

Noteholders must be paid post-petition interest before the Convertible Noteholders may receive

any distributions from the Debtors.   In their answer, filed on July 18, 2013, the Defendants deny

---

[2] As a result of the filing, all prepetition accrued interest became due; this includes amortized original issue discount
(the "OID") to the date of the petition.

that the Senior Notes benefit from the subordination provisions of the Convertible Notes Indenture to the extent of post-petition interest.

In a pretrial order, an expedited trial of the issues in dispute was scheduled for August 23, 2013, and the parties were given the opportunity to file pre-trial briefs. At a subsequent conference, the Defendants indicated a desire to have the schedule adjusted to allow for summary judgment motions to be addressed prior to trial. The Court retained the same schedule but informed the parties that they could file summary judgment motions along with their pre-trial briefs. On August 16, 2013, the Plaintiffs filed their pre-trial brief, and the Defendants filed a motion for summary judgment along with their pre-trial brief.

In their summary judgment motion, the Defendant Convertible Noteholders assert that the facts are not in dispute or can be derived from the public record, and that the terms of the Convertible Notes Indenture are plain and unambiguous and should be construed as a matter of law in their favor. Alternatively, they argue that the evidence will show that the subordination provisions were drafted with the intent of limiting the definition of "Senior Indebtedness" and under the Rule of Explicitness, further discussed below, the Senior Noteholders do not have priority rights to post-petition interest. In contrast, the Plaintiffs argue that the Senior Notes come within the definition of "Credit Facility" under the Convertible Notes Indenture and that they are accordingly entitled to post-petition interest prior to any distribution to the Convertible Noteholders. The Plaintiffs further argue that, even if the Senior Notes do not fall within the definition of "Credit Facility," (i) the priority position of the Senior Notes extends to post-petition interest, and (ii) the Rule of Explicitness has been superseded by § 510(a) of the Bankruptcy Code, giving them a priority position.

*The Rule of Explicitness*

As demonstrated by the foregoing, this case involves the rights of senior creditors to enforce a subordination provision and recover post-petition interest.   It involves the so-called Rule of Explicitness, which was developed to deal with this precise issue.   The background is as follows.

The Bankruptcy Code, like the prior Bankruptcy Act, generally disallows post-petition interest.   11 U.S.C. §§ 502(b)(2) (Bankruptcy Code); 11 U.S.C. § 63(a) (repealed 1979) (prior Bankruptcy Act).   As a result of the disallowance of post-petition interest as a matter of law, the question arose in several Bankruptcy Act cases whether a creditor holding senior debt could enforce subordination rights and demand payment of post-petition interest prior to any distribution to the subordinated creditors even though its claim to such interest was not allowed as a matter of law.   The prior Bankruptcy Act did not have an express provision relating to contractual subordination.

Three decisions prior to the adoption of the Bankruptcy Code held that the subordination provisions in the documentation for subordinated debt had to provide explicitly for a senior creditor's right to post-petition interest (rather than merely a right to "interest") if post-petition priority rights were to be enforceable.   *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. First Nat'l City Bank of N.Y. (In re King Res. Co.)*, 528 F.2d 789 (10th Cir. 1976); *Bankers Life Co. v. Mfrs. Hanover Trust Co. (In re Kingsboro Mortg. Corp.*, 514 F.2d 400 (2d Cir. 1975); *In re Time Sales Fin. Corpl*, 491 F.2d 841 (3d Cir. 1974).   This so-called "Rule of Explicitness" was known to drafters of indentures.   In 1983, the American Bar Association (the "ABA") published a model indenture, updating its earlier version and setting forth "an example of the type of explicit language that would prioritize post-petition interest."   *HSBC Bank v. Bank of New York Mellon*

*Trust Co., (In re Bank of New England Corp.)*, 646 F.3d 90, 98 (1st Cir. 2011).[3]   The Model

Debenture Indenture adopted by the ABA in 1999 contained a similar clause also providing for

explicit priority rights to post-petition interest, even though not allowed as a claim in a bankruptcy

case.   The clause in the Indenture in this case generally follows this standard language to the

extent it includes in the definition of Senior Indebtedness, "all interest accrued subsequent to the

commencement of any bankruptcy or similar proceeding, whether or not a claim for post-petition

interest is allowable as a claim in any such proceeding . . . ."

Unlike the prior Bankruptcy Act, which was silent on the subject of contractual

subordination, the Bankruptcy Code provides that "A subordination agreement is enforceable in a

case under this title to the same extent that such agreement is enforceable under applicable

nonbankruptcy law."   11 U.S.C. § 510(a).   The question therefore arose after the effectiveness of

the Code in 1979 whether "the Rule of Explicitness" had survived the adoption of the Code.   An

early case in this Court held that it had.   *In re Ionosphere Clubs*, 134 B.R. 528 (Bankr. S.D.N.Y.

1991).   A later case in the Eleventh Circuit held that the question was one of "applicable

nonbankruptcy law" under § 510(a) and certified to the highest court of New York, whose law

governed the indenture there, the question, "What, if any, language does New York law require in

a subordination agreement to alert a junior creditor to its assumption of the risk and burden of the

senior creditor's post-petition interest?"   *In re Southeast Banking Corp.*, 156 F.3d 1114, 1125

(11th Cir. 1998).   The New York Court of Appeals responded by holding that "this Court can and

should recognize the Rule of Explicitness" and that in order to include post-petition interest as

---

[3]  The 1983 Model Indenture provided that, in the event of bankruptcy or a similar proceeding, before subordinated
creditors are entitled to receive any payment, "holders of Senior Debt shall be entitled to receive payment in full in
cash of the principal of and interest (*including interest accruing after the commencement of any such proceeding*").
*Id*. quoting § 11.03 of the 1983 Model Indenture (other citation omitted) (emphasis in original).

senior debt, "New York law would require specific language in a subordination agreement to alert a junior creditor to its assumption of the risk and burden of allowing the payment of a senior creditor's post-petition interest demand." *Matter of Southeast Banking Corp*., 93 N.Y.2d 178, 186, 688 N.Y.S.2d 484, 710 N.E.2d 1083 (1999). The New York Court stated that "Parties to subordination agreements undoubtedly relied on the Rule – their lawyers would have been quite remiss if they had not – since recent case law, as well as a leading authority and many commentators have consistently recognized the continued vitality of the Rule." 93 N.Y.2d at 184, citing *Ionosphere Clubs* and 4 COLLIER ON BANKRUPTCY § 510.03[3] (15th ed. rev). It noted, "In addition to practical realities, however, we are persuaded that the commercial and legal policies underlying the Rule of Explicitness remain sound and relevant." *Southeast Banking*, 93 N.Y.2d at 184.

In a subsequent decision, the First Circuit held that the Bankruptcy Code had "extinguished the Rule of Explicitness in its classic form" and that even though the Indenture there was governed by New York law, the New York Court of Appeals had no authority to determine an issue that would apply only in a Federal bankruptcy case and that the Rule of Explicitness was not part of "New York's general contract law." *HSBC Bank USA v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355, 664-65 (1st Cir. 2004). Whatever the validity of this holding, the Court went on to demonstrate why the Rule of Explicitness is alive and well notwithstanding the adoption of § 510(a) of the Bankruptcy Code. Since the indenture there was necessarily deemed ambiguous because it provided only for the payment of "interest due or to become due," the Court remanded for trial of the "parties' intent, taking full account of the surrounding facts and circumstances." After a lengthy trial on remand, including testimony from James Gadsden (who testified at the trial here), the Bankruptcy Court held that the language of the indenture there was

10

not sufficiently explicit (my term) to cover post-petition interest, and its holding was affirmed on

appeal. *HSBC Bank USA, N.A. v. Bank of New York Mellon Trust Co., N.A. (In re Bank of New*

*England Corp.)*, 646 F.3d 90 (1st Cir. 2011). It would appear that in order to avoid much

uncertainty and a lengthy trial, the Rule of Explicitness should be followed. The Indenture at

issue in this case followed the Rule of Explicitness but then inserted in the definition of Senior

Indebtedness a non-standard clause, "with respect to the Credit Facility." The main question in

this case is what that means.

DISCUSSION

Plaintiffs make three arguments in support of declaratory relief that they are entitled to

enforce their rights as senior creditors and obtain post-petition interest of approximately $32

million before Convertible Noteholders obtain any distribution. Plaintiffs first argue that the

disputed contractual provision is clear on its face, that the words "including, with respect to the

Credit Facility," in the definition of "Senior Indebtedness" are inclusive, and that the reference to

the Credit Facility is only "illustrative." Plaintiffs next argue that the so-called "Rule of

Explicitness" (discussed above) has been abolished and that they are accordingly entitled to

post-petition interest by virtue of their admitted priority rights to the recovery of "interest" under

the subordination provisions of the Indenture. Finally, Plaintiffs contend that since the definition

of "Credit Facility" in the Indenture includes a "replacement" for that facility, and since they hold

debt that is the "functional" replacement of the Credit Facility debt, they have priority rights to

post-petition interest. We will consider Plaintiffs' three points *seriatim*.

*The Plain Meaning of the Disputed Contractual Provision*

Defendants agree with Plaintiffs that the definition of "Subordinated Indebtedness" in the

Indenture is unambiguous but contend that it has precisely the opposite meaning -- that the words

11

"with respect to the Credit Facility" are limiting and that only post-petition interest under the "Credit Facility" falls within the definition of Senior Indebtedness.   Defendants moved for summary judgment on this point but, in light of the lack of time to issue a separate summary judgment decision, the Court reserved decision on the motion and heard all of the evidence proffered by the parties.   It now concludes that the clause is not ambiguous and that Defendants' reading of the clause is the only plausible construction.

Indentures are contracts, to be construed in accordance with ordinary contractual principles.   In a very recent decision, the Second Circuit quoted prior authority and held that "It is a well-established rule in this Circuit that the 'interpretation of Indenture provisions is a matter of basic contract law.'"   *Bank of New York Trust Co. N.A. v. Franklin Advisers, Inc.*, ___ F.3d ___, 2013 WL 3942430 at *5 (2d Cir. Aug. 1, 2013), quoting *Jamie Sec. Co. v. The Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989), which in turn quoted *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039, 1049 (2d Cir. 1982).   Under basic principles of contract law in New York, whose law governs the Indenture, words are to be given their plain reading.   *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005) ("under New York law, 'words and phrases . . . should be given their plain meaning'").   Moreover, "when interpreting a contract the entire contract must be considered so as to give each part meaning."   *Bank of New York v. Franklin Advisers*, 2013 WL 3942430 at *5, quoting *Brooke Group Ltd. v. JCH Syndicate 488*, 663 N.E. 2d 635, 637 (N.Y. 1996).

Application of these basic principles leads to rejection of Plaintiffs' construction of the provision in question.   Plaintiffs insist that the key words, "with respect to the Credit Facility," constitute a dependent clause that modifies the word "including."   However, the clause at issue cannot be read to modify the preposition "including."   It obviously modifies the words that come

12

immediately after, "all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding …"   The plain meaning is that the inclusion of post-petition interest in the definition of Senior Indebtedness is limited to ("with respect to") the Credit Facility.

Plaintiffs argue, correctly, that the word "including" is defined in the Indenture as "including, without limitation." (Convert. Indent. § 1.04(d).)[4]   They contend that we must construe the provision in question as if it read "including [without limitation], with respect to the Credit Facility, all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding . . . ."   However, inclusion of the words "without limitation" in the subject clause does not lead to the construction that Plaintiffs want, that the Credit Facility is deemed only one of an inclusive series of borrowings that would get the benefit of subordination with respect to post-petition interest.   The word "Credit Facility" does not follow the word "including" as if it were one of a series "without limitation."   The words between "including" and "Credit Facility" are "with respect to," spelling out that the benefit of subordination of post-petition interest is given to the "Credit Facility," as defined.

The object of the preposition "including" is "all interest accrued subsequent to the commencement of any bankruptcy or similar proceeding . . . ."   Construing the term "including" as meaning "including without limitation post-petition interest" makes total sense.   The definition of Senior Indebtedness includes "interest" on Indebtedness, and the drafters of the Indenture had

---

[4] There is a similar rule of construction in the Bankruptcy Code.   *See* 11 U.S.C. § 102(3) (providing that "'includes' and 'including' are not limiting.")

every reason to make it clear that the inclusion of a provision dealing with post-petition interest would not imply that prepetition interest was not within the definition of Senior Indebtedness.[5]

Based on the foregoing, Defendants were entitled to summary judgment as to the plain meaning of the phrase in question, the first of the issues raised in the Complaint.   As a consequence of the pressure of time, as mentioned above, the Court heard evidence on all issues, including background with regard to the drafting of the Indenture for the Convertible Notes and custom and practice with regard to the drafting of clauses providing for the right of senior creditors to obtain the benefit of subordination with respect to a claim for post-petition interest.[6]   The available evidence supports the Court's construction of the phrase.

It appears that the words "with respect to the Credit Facility" were introduced in an exchange of drafts between counsel for the prospective Convertible Noteholders and counsel for the holder of the then Senior Debt, LaSalle National Bank.   The first draft, prepared by counsel for the Convertible Noteholders, had no provision at all relating to post-petition interest, thereby putting the Senior Creditors at risk of not having such rights.[7]   A subsequent draft included the boilerplate provision providing that post-petition interest would be covered, and the next draft then inserted the clause at issue, "with respect to the Credit Facility."   Although the record does not clearly show who introduced those five words, it seems obvious that they were inserted at the request of counsel for the Convertible Noteholders, as they reduce the scope of the subordination

---

[5]  In fact, there is no issue in this case that Senior Noteholders are entitled to prepetition interest before the Convertible Noteholders receive any distribution.   The only dispute relates to post-petition interest.

[6]   The Circuit Court held in *Bank of New York Trust Co. v. Franklin Advisors* that the use of such information is not error, especially when construing indenture provisions that are not boilerplate. 2013 WL 3942430 at *4.   As discussed above, some of the language in the definition of Senior Indebtedness may be considered boilerplate but the words "with respect to the Credit Facility" are not.

[7]  See discussion above relating to the Rule of Explicitness.

when it counts the most -- in the event of a bankruptcy.    In any event, the only relevant testimony

in the record is that of counsel for LaSalle, who testified that the clause providing for inclusion of

post-petition debt in the definition of Senior Indebtedness was drafted so as to give LaSalle

protection.    The testimony of LaSalle's counsel is consistent with the construction of the relevant

phrase as limiting, as LaSalle held the "Credit Facility" and would be protected even if subsequent

holders of Senior Indebtedness were not.    A "contract must be read to conform to the parties'

reasonable expectations."    *Bank of New York Trust Co. v. Franklin Advisors*, 2013 WL 2942430

at *6, citing *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*, 85 F.2d 21, 28 (2d Cir. 1996).

The foregoing construction of the clause at issue is consistent with the reasonable expectations of

the Convertible Noteholders and LaSalle, the parties who negotiated and were most immediately

affected by the subject clause.

　　　Plaintiffs nevertheless point out that the Indenture for their Notes, the Senior Indenture, has

a definition of the term "Obligation" that contains only the standard language relating to

post-petition interest, defining "Obligation" as including post-petition interest and omitting the

words, "with respect to the Credit Agreement."    (Pl. Ex. 41, Sr. Indent. § 1.01.)    They say that

KV, as the issuer of the Senior Notes, represented in the Senior Notes Purchase Agreement that

"[t]he representations and warranties of the Company and each Guarantor [were] true and correct

in all material respects . . . ."    Pl. Ex. 42, Sr. Notes Purch. Agmt. § 6(h).[8]    They further claim that

this demonstrates that KV, as the issuer of both the Senior Notes and the Convertible Notes,

"understood the Convertible Notes to be subordinated to the Senior Notes' accrued post-petition

---

[8]  The Plaintiffs assert that, in this instrument, KV also represented that entry into the Senior Notes Indenture and
issuance of the Senior Notes would not conflict with "any agreement, indenture or instrument to which [KV] or any of
its Subsidiaries is a party. . . ."  (Pl. Ex. 42, Sr. Notes Purch. Agmt., § 3(d).)

interest" and that this constitutes a course of performance under a contract and "the best evidence" of the parties' intent in entering into the contract.   Pl. Br. at 33, quoting *Waverly Corp. v. City of New York*, 851 N.Y.S.2d 176, 179 (N.Y. App. Div. 1st Dept. 2008).

Plaintiffs cannot find a pattern and practice of conduct in the construction of the Convertible Notes Indenture in the history they cite.   The term "Obligation" in the Senior Notes Indenture defines the indebtedness that KV is obligated to repay and that is secured by the Collateral.[9]  There is no question that an "Obligation" of KV is to pay interest, including post-petition interest in the event of a bankruptcy, and that this Obligation is secured by the Collateral that supports the Senior Notes.   There is also no question that if the Collateral securing the Senior Notes had a value that covered post-petition interest, the Senior Noteholders would be entitled to post-petition interest under § 506(b) of the Bankruptcy Code.   Since there is no dispute that the Collateral does not have sufficient value, the Senior Creditors can only obtain post-petition interest if they are able to enforce the subordination provisions of the Convertible Notes Indenture and take it from the distribution to the Convertible Noteholders.   There is no inconsistency between a broader definition of the term "Obligation" in the Senior Notes Indenture as compared to the definition of "Senior Indebtedness" in the Convertible Notes Indenture.

In any event, to determine the extent of any subordination clause, one has to look at the agreement of the creditor who agreed to the subordination, not to the debt instrument of the senior creditor.   In this case, this means the Indenture governing the Convertible Notes.   James Gadsden, Defendants' expert on custom and practice in the drafting of indentures, so testified without contradiction.   As for the Plaintiffs' claim that KV misrepresented the extent of the

---

[9] A Pledge and Security Agreement granted the collateral agent for the Senior Noteholders a security interest in certain of KV's assets, for payment of "Obligations."   (Pl. Ex. 94, Pledge and Security Agmt., § 2.1.)

subordination, there was no testimony at trial from any of the Plaintiffs, some of whom are the

original holders of the Senior Notes, that they or their counsel failed to review the definition of

"Senior Indebtedness" in the Convertible Notes Indenture or take account of the explicit limitation

contained therein.   Indeed, it is disingenuous for Plaintiffs to claim that KV represented in an

information memorandum to them that the Convertible Notes "are subordinate to all of [KV's]

existing and future obligations."   There is no evidence that any of the Senior Noteholders was

confused by this overbroad generalization -- debt is ordinarily subordinated to Senior

Indebtedness, as defined, not all future obligations.   In any event, a statement by KV cannot bind

the Convertible Noteholders if the subordination is not provided for in their Indenture.

### *The Rule of Explicitness*

The Plaintiffs' second argument is that "Rule of Explicitness," which is discussed above,

was abrogated by the adoption of § 510(a) of the Bankruptcy Code in 1978 and that they are

entitled to priority rights to post-petition interest simply because the Convertible Notes Indenture

provides for the recovery of "interest."   We suggest above that Plaintiffs are premature in

declaring the death of the Rule of Explicitness.   In any event, Plaintiffs' argument depends on the

proposition that the words, "with respect to the Credit Facility," are not limiting.   Whatever the

result would have been had the Convertible Notes Indenture not included *any* provision relating to

post-petition interest, it *did* have such a provision, and it then limited that provision.   The Rule of

Explicitness provides useful background with respect to the drafting of the Convertible Notes

Indenture, but it does not determine the outcome of this case.

### *The Senior Notes as a Replacement for the LaSalle Facility*

Plaintiffs' final and best argument is that the Senior Notes are a "replacement" for the

LaSalle facility and thus entitled to priority in the payment of post-petition interest.   There is no

17

dispute that debt under the "Credit Facility" is entitled to such priority.   As noted above, "Credit

Facility" is defined in the Indenture as

> that certain Loan Agreement dated as of June 18, 1997, as amended,
> among the Company, certain subsidiaries of the Company and
> LaSalle Bank National Association, including all related notes,
> guarantees, collateral documents, instruments and agreements
> executed in connection therewith, as each may be *amended,*
> *modified, restated, renewed, replaced, refinanced or restructured*
> (including, without limitation, any amendment increasing the
> amount of available borrowing) from time to time.   (Convert.
> Indent. § 1.01.) (Emphasis added)

Plaintiffs contend that the Senior Notes facility falls squarely within the definition of Credit

Facility because it constitutes the original LaSalle Credit Facility as it was "amended, modified,

restated, renewed, replaced, refinanced or restructured."

As the parties recognize, there was a substantial gap in time between the termination of the

LaSalle facility in 2006 and the issuance of the current Senior Secured Notes in 2011.   In the

interim, the LaSalle facility was amended several times and restated and then admittedly

"replaced" by the 2006 Citibank Facility.   In 2010, the Debtor was effectively prohibited from

manufacturing drugs under a consent decree with the FDA, Citibank called a default and was

repaid in full, and thereafter, the Debtor had no term or revolving borrowings until September

2010.   The present Senior Secured Notes, in $225 million principal amount, were issued on or

about March 17, 2011.

It is evident from the foregoing history that the Senior Secured Notes did not "replace" the

LaSalle facility in a temporal sense, and the Senior Noteholders do not argue otherwise.   There is

also no dispute that the Senior Notes did not amend, modify, restate, renew, refinance or

restructure the LaSalle facility, as each of these terms implies a direct change to or payment of the

earlier debt.   The Senior Creditors do contend, however, that the term "replace" should be

18

construed in a "structural" sense, and that on a structural basis the Senior Notes took the place of

(replaced) the LaSalle facility in the Debtor's capital structure as senior debt for money borrowed,

even though there was a substantial gap in the Debtor's borrowing on such terms.    The Senior

Creditors have collected authority (including dictionary definitions) that supports their position

that there can be a replacement notwithstanding a gap in time, and they introduced the testimony of

Prof. Bradford Cornell, an expert in finance, that he would expect a company such as KV to have

senior debt and that the Senior Notes play the same role in its capital structure as the LaSalle

facility did.    Plaintiffs conclude that their Notes are a "Credit Facility" for purposes of the

definition of Senior Indebtedness because their facility "replaced" LaSalle's structurally.

Plaintiffs have identified an ambiguity in the use of the term "replacement," but their

argument that the term "replacement" should be construed to include any senior debt that was the

functional equivalent of the LaSalle debt must be rejected.    The issue before the Court is the

intention of the parties to the Convertible Notes Indenture when their lawyers drafted that

instrument, and particularly what they intended when they inserted the words "with respect to the

Credit Facility" in the definition of Senior Indebtedness and thereby limited the scope of senior

creditors' priority.    On the record of this case, construction of the term "Credit Facility" as

equivalent to "senior indebtedness for money borrowed" would render the phrase "with respect to

the Credit Facility" largely illusory, as any senior debt would be entitled to the benefits of

subordination.    Since there is nothing in the record that any senior debt other than the LaSalle

facility existed, or that any such debt was contemplated,[10] there would have been no reason to

---

[10] The only indication in the record that the Debtor had any borrowings other than the LaSalle facility and the
subsequent senior debt described above, as well as the Convertible Notes, is the testimony of the Debtor's chief
financial officer, Thomas McHugh.    He testified at deposition, introduced into the record, that when the 2006
Citibank Facility was repaid, he thought that there was some mortgage debt outstanding in addition to the Convertible

insert the limiting words, "with respect to the Credit Facility" if the result would merely prioritize

all senior debt for the remaining 22 years of the Convertible Notes.   It is a cardinal principle that

contracts must be construed, if possible, so as to give each provision meaning.   *LaSalle Bank v.*

*Nomura Asset Capital Corp.*, 424 F.3d at 206.   Construction of the term "Credit Facility" in a

manner that equates it with "senior debt" deprives the limitation in the definition of Senior

Indebtedness of any meaning.

   Restriction of the concept of "replacement" to a facility which temporally replaced the

LaSalle facility, on the other hand, is consistent with the construction of the clause "with respect to

the Credit Facility" as a limiting concept.   It is also consistent with the use of the terms

"refinance" or "restructure" in the definition of "Credit Facility."   A refinancing of the LaSalle

facility would encompass a new facility whose proceeds were directed to the prior lender by the

new lender.   A restructuring would leave the old facility in place, in whole or in part, but change it

substantially.   A replacement would provide new funds to the debtor that would be used, directly

or indirectly, and in part or in whole, to pay off the LaSalle facility.   There is in fact one such

replacement facility in the record, and there was no dispute among the parties that the 2006

Citibank Facility "replaced" the LaSalle facility.   (Def. Ex. 7, Form 10-K.)

   Construction of the term "replaced" in the manner discussed above is also supported by the

record.   The only testimony from the lawyers who actually drafted the Convertible Notes

Indenture was that of Matthew O'Connor of the Vedder Price firm in Chicago (by deposition

excerpt).   O'Connor had no specific recollection of the negotiation of the words, "with respect to

---

Subordinated Notes.   (McHugh Dep., 223: 9 – 224:10.)   However, there was no testimony that this mortgage debt
was Senior Indebtedness for purposes of the Convertible Notes, that any such indebtedness was outstanding in 2003
when the Convertible Notes were issued, or that the existence of such debt was considered by the drafters of the
Convertible Notes Indenture.

the Credit Facility." However, when asked what he meant by the term "replaced," he replied,

"Typically that would encompass an amendment restatement or a refinance." (O'Connor Dep.,

8/1/2013 at 33:8-11, 72:4-16.) He added that the word "replace" "would provide a mechanism by

which the LaSalle facility would be replaced and taken out and LaSalle would be paid off." (*Id*. at

34:14-16.) If the Company used cash on hand to repay a lender and "no other lender came in and

provided funds to K-V to pay down the LaSalle facility," he would not "typically" view that as a

replacement. (*Id*. at 69:6-16.)

       O'Connor also testified that his intent in drafting the Indenture was to protect LaSalle:

> A.  Our role on behalf of LaSalle was to review the indenture
> and/or confidential offering memorandum to ensure the notes were
> subordinate and LaSalle had a priority position.
> Q. Did you have any other goal with respect to the transaction?
> A. We did not." (O'Connor Dep., 8/1/2013 at 28:13-19.)

Prof. Cornell on behalf of Plaintiffs theorized that this testimony would not rule out a functional

definition of the term "replacement" because LaSalle would be better protected if the

subordination provisions in the Convertible Notes Indenture covered, as to post-petition interest,

not only LaSalle and any replacement, but every senior lender for an indeterminate period of time.

Prof. Cornell reasoned that it would be easier to get financing to "replace" the LaSalle debt if the

new lender could be confident that *its* replacement would also have the benefit of priority recovery

for post-petition interest in the event of a bankruptcy. This is a reasonable theory, but it cannot

substitute for the lack of any record evidence that LaSalle took such a long view. On the contrary,

in the negotiation of the Convertible Notes Indenture, in the back and forth between counsel intent

on advancing the interests of the Convertible Noteholders, on the one hand, and counsel who

sought to protect LaSalle, on the other, the available record evidence is that counsel for LaSalle

acceded to a non-traditional amendment that limited post-petition interest that could be claimed in

the future since any disadvantage to his client was speculative and remote.    His agreement to this language, and the agreement of the Senior Noteholders to extend senior debt to KV notwithstanding the existence of this language, confirms that the Senior Noteholders have no claim to priority payment of post-petition interest.

CONCLUSION

For the reasons stated above, the Court declares that the Senior Noteholders cannot, under the subordination provisions of the Senior Notes Indenture, recover post-petition interest from the distribution to the Convertible Noteholders.    The Defendants may settle a judgment on three days' notice.

IT IS SO ORDERED.


Dated: New York, New York
        August 27, 2013

**s/Allan L. Gropper**
UNITED STATES BANKRUPTCY JUDGE